IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

SHAWN K. MORGAN,

Defendant.

8:12CR281

**MEMORANDUM AND ORDER**

This matter is before the court on defendant's objection, Filing No. 30, to the findings and recommendation of the magistrate judge ("F&R"), Filing No. 29, on defendant's motion to suppress, Filing No. 18.  The magistrate judge recommends that this court grant the defendant's motion to suppress the defendant's pre-*Miranda* statements, but deny the defendant's motion to suppress his post-*Miranda* statements and the evidence found in the search of his vehicle.  The defendant objects to the those portions of the magistrate judge's F&R that deny suppression.  The defendant is charged with knowingly and intentionally possessing with intent to distribute 5 grams or more of actual methamphetamine, its salts, isomers, and salts of its isomers.

Pursuant to 28 U.S.C. § 636(b)(1), this court has conducted a de novo review those portions of the F&R to which the defendant objects.  *United States v. Lothridge,* 324 F. 3d 599, 600-01 (8th Cir. 2003).  The court has reviewed the record, including the transcript of the suppression hearing on October 4, 2012.  Filing No. 28.

**I. Facts**

The court generally agrees with the magistrate judge's recitation of the facts and supplements the magistrate judge's factual findings only as necessary to this opinion.

To restate the facts briefly, on April 17, 2012, Officers Aram Normandin and Josh Downs of the Omaha Police Department ("OPD") were conducting a patrol around businesses that were open 24 hours a day to look for suspicious activity. Filing No. [28] at 3, 9. This patrol was in response to robberies at several convenience stores in the area. *Id.* At 12:45 a.m., the officers drove into the well-lit parking lot of the Hy-Vee grocery store near 79th and Cass Streets in Omaha. *Id.* at 4-5. The officers had not received reports of any robberies at the Hy-Vee. *Id.* at 10. Officer Normandin observed a black sedan backed into a parking stall near the marked Hy-Vee store vehicles in the far southeast corner of the lot. *Id.* at 4, 24. The officers had no reports of a vehicle similar to the defendant's having been involved in any crime. *Id.* at 11. Officer Normandin testified that there were approximately ten other cars in the lot. *Id.* at 11, 24.

The officers stopped, exited their patrol vehicle, and approached the parked vehicle. *Id.* at 5-6. Officer Normandin testified that the reason he and his partner approached the vehicle was because "somebody was in the vehicle ducked down." *Id.* at 12. He acknowledged that his initial report of the incident does not mention people "ducked down." *Id.* at 13.

On approaching the vehicle, Officer Normandin observed the defendant place his hand under his seat, and became concerned for officer safety at that moment. *Id.* at 6, 15. Both officers then drew their service weapons. *Id.* Officer Normandin testified he and his partner "pointed [the weapons] at the driver and the other occupants of the vehicle" and told occupants to show the officers their hands. *Id.* at 15. The other occupants of the car were two young girls who appeared to have been drinking and

acted "real nervous." *Id.* at 8. Officer Nomandin also observed open containers of alcohol around the feet of the females. *Id.*

He testified the defendant did not take his hands out from under the seat "at first," but complied on the second request. *Id.* at 15-16. Officer Normandin testified he "opened the door and removed [the defendant] from the car." *Id.* at 17. Both officers had their weapons pointed at the occupants before they were removed from the vehicle. *Id.* After the defendant and the passengers were removed from the car, they were all handcuffed. *Id.*

Within one or two minutes, two other officers in a police cruiser arrived for backup, and one of those officers took the defendant and passengers a considerable distance away from the car and sat them on a curb. *Id.* at 18, 23. The officers then proceeded to search the vehicle. *Id.* at 18. Officer Normandin stated he immediately searched the vehicle as soon as he removed the occupants. *Id.* at 23. The other officers were present at the time he initiated the search. *Id.* The defendant and the girls were "some distance" from the car when he was searching for the weapon. *Id.* at 20. He further testified that he had called for backup when he and his partner first approached the vehicle, before observing any gesture under the seat. *Id.*

Officer Normandin testified the purpose of the search was "officer safety." *Id.* He stated that once he "pulled all the occupants out of the vehicle, [his] concern at that point was that we had a weapon under that seat." *Id.* at 6. When he looked under the seat of the car, he saw a couple of baggies of marijuana, a black notebook and a cellphone. *Id.* at 19. When he reached under the seat, he felt a lockbox. *Id.* at 20. He

stated it was a three-combination lockbox, but it was unlocked at the time. *Id.* at 7. He stated the box was roughly ten inches by six inches and was big enough to conceal a handgun. *Id.* He removed the lockbox from the car and asked the defendant what was in it. *Id.* at 7, 21. Officer Normandin stated that, at that point, the defendant was not under arrest, but was not free to leave. *Id.* at 21.

The defendant responded, "there's meth in there" and "I'm a dealer." *Id.* Once he was told by the defendant that there was methamphetamine in the box, "the box was opened." *Id.* at 8. He found methamphetamine and another container with a white, powdery substance" in the lockbox. *Id.* at 9. The officers then advised the defendant of his *Miranda* rights. *Id.* at 9. He further stated the "couple baggies of dope" he had seen under the seat "were not important to [him] at the time." *Id.* at 20. He explained that at the time he found the box he was not concerned about narcotics because "in [his] experience, [he'd] had many dealings with finding drugs in cars in the past couple of years, and [he'd] never found one where a dealer has hidden drugs in that type of a box." *Id.* He testified he was "more concerned for [the officers'] safety than [he was] looking for drugs." *Id.*

After he was Mirandized, the defendant stated that he was a drug dealer from Fremont who did deals in Omaha for which there was methamphetamine in the box. *Id.* at 9. Officer Normandin asked the defendant what the powdery substance was, and the defendant said it was cocaine. *Id.* at 8. The substances were field-tested and results were positive for methamphetamine and cocaine. *Id.* at 9. At that time, Officer Normandin formally placed the defendant under arrest. *Id.* at 9. The defendant was

indicted for possession with intent to distribute 5 grams or more of actual methamphetamine.[1]  Filing No. 1, Indictment.  The indictment also contained a forfeiture allegation with respect to $1,780 in United States currency "seized from the person of SHAWN K. MORGAN on April 17, 2012."  *Id.*

The defendant filed a motion to suppress his statements and the evidence found in his vehicle.  He contends:  (1) no probable cause existed for his arrest at the time officers approached him and he was handcuffed; and (2) no probable cause or other legal justification exists for the warrantless, nonconsensual vehicle search.

The magistrate judge first determined that the officers' initial contact, approaching the defendant's vehicle, did not implicate any Fourth Amendment interest, but almost immediately became an investigative detention.  Filing No. 29, F&R at 4.  He found, based on the totality of the circumstances, that the officers had "a reasonable concern for their safety based on the recent robberies in the area and Morgan's conduct."  *Id.* at 6.  He concluded that the officers had "a reasonable suspicion to detain Morgan and were entitled to conduct a protective sweep of Morgan's vehicle and subsequently search the box under Morgan's seat, to determine whether Morgan concealed a firearm."  *Id.* at 7.

The magistrate judge further stated:

> The holding from [*Arizona v.*] *Gant* does not require suppression in this case.  The officers did not have probable cause to arrest Morgan prior to the vehicle's search.  Officer Normandin initiated his search of the vehicle and the box out of concern for officer safety.  The reasonable concern would not dissipate absent a search of the vehicle for weapons, despite Morgan's initial removal from the vehicle, because the circumstances of

---

[1] Five grams is the equivalent of 0.176 ounces and 50 grams is the equivalent of to 1.76 ounces.

this case justified the officer's reasonable belief that Morgan posed a danger if he were permitted to reenter his vehicle.

*Id.* at 8-9.   Accordingly, the court found no "constitutional infirmities with the officers' initial contact with Morgan, subsequent investigative detention, and search."  *Id.* at 9.

With respect to the statements, the magistrate judge determined that the pre-*Miranda* statements should be suppressed as violations of the defendant's Fifth Amendment rights because the statements were elicited during a custodial interrogation.  *Id.* at 12.  He found, however, that the statements the defendant made after he had been Mirandized should not be suppressed because the defendant "does not argue his post-*Miranda* statements … were made involuntarily" and there was no evidence he had "invoked his right to remain silent or that the officers subjected Morgan to prolonged questioning or coerced confessions from him."  *Id.* at 13-14.

The magistrate judge rejected the defendant's argument that the his post-*Miranda* statements as well as the evidence seized from the vehicle should be suppressed as fruit of the poisonous tree.  *Id.*  In finding that the evidence obtained in the search was not subject to suppression, the magistrate judge relied on the principle that "[t]he exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-Mirandized statement." *Id.* (citing *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013 (8th Cir. 2003)).  The magistrate judge alternatively found the fruit of the poisonous tree doctrine was not applicable because "Officer Normandin would have lawfully searched the box under Morgan's seat because of officer safety even if Morgan did not inform Officer

Normandin narcotics were contained within the box" and thus the evidence would have inevitably been discovered.  *Id.* at 13.

## II.  Law

### A.  Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "The simple language of the Amendment applies equally to seizures of persons and to seizures of property."  *Payton v. New York*, 445 U.S. 573, 584 (1980).  It applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.  *United States v. Brignoni-Ponce* 422 U.S. 873, 878 (1975); *Davis v. Mississippi*, 394 U.S. 721 (1969); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968).

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity; and (3) physical arrests, which must be supported by probable cause.  *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144 (8th Cir. 2007).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  The government bears

the burden of proving that an exception to the warrant requirement exists.  *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007).

An investigative detention must be supported by a reasonable articulable suspicion of criminal activity.  *United States v. Green*, 691 F.3d 960, 963 (8th Cir. 2012). Reasonable suspicion exists when "the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed."  *Id.*  The officers must act on more than just a "hunch" or on circumstances which describe a very broad category of primarily innocent people.  *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted).

"In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them."  *United States v. Maltais*, 403 F.3d 550, 555 (8th Cir. 2005) (internal quotation omitted).  Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (unprovoked flight at sight of officers in high crime area reasonably aroused officers' suspicions).  Further, even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity.  *Id.* at 125.

"Although "[t]here is no bright line of demarcation between investigative stops and arrests," a de facto arrest occurs when "'the officers' conduct is more intrusive than

necessary for an investigative stop.'" *United States v. Bloomfield*, 40 F.3d 910, 916-17 (8th Cir. 1994) (en banc) (citation omitted). Time is an important factor in distinguishing between an investigative stop and a de facto arrest, as is "'the degree of fear and humiliation that the police conduct engenders.'" *Id.* at 917 (quoting *United States v. Lego*, 855 F.2d 542, 544-45 (8th Cir. 1988)). Transporting a suspect to another location or isolating him from others can create an arrest and "[a]dditional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car." *Bloomfield*, 40 F.3d at 917. Courts must also consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *Id.* Further, an investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999).

The Eighth Circuit Court of Appeals has identified "three noncontroversial and well-established principles of Fourth Amendment jurisprudence" in this context *See United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012). "First, the scope of an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), is limited." *Id.* "While an officer may conduct a limited, warrantless search of a suspect 'if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous,' the scope of such a search 'must be confined to a search reasonably designed to discover concealed weapons.'" *Id.* (quoting *Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002). The sole justification for such a search is the protection of the officer and others. *Aquino*, 674 F.3d at 923. Because of the limited scope of an

investigatory detention under *Terry*, officers "must use the least intrusive means that are reasonably necessary" to protect officer safety. *Id.* (quoting *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011)).

The second well-established principle is that "where an officer exceeds the permissible scope of *Terry*, the investigatory detention is transformed into an arrest." *Id.* at 924; *see Peterson v. City of Plymouth,* 945 F.2d 1416, 1419 (8th Cir. 1991) (listing the factors a court should consider "[i]n determining whether an officer's conduct during a purported investigatory stop exceeded the scope justified under the circumstances, thereby transforming the stop into an arrest");[2] *United States v. Maltais*, 403 F.3d at 556.

An officer's conduct in directing a person to exit his vehicle and conducting a protective search triggers Fourth Amendment scrutiny. *See United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011); *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) ("A protective frisk is both a search and a seizure for Fourth Amendment purposes."). The "protection of police and others can justify protective searches when police have a reasonable belief … that danger may arise from the possible presence of

---

[2] Courts should consider the following factors:

(1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*Peterson*, 945 F.2d 1419-20.

weapons in the area surrounding a suspect." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *United States v. Smith*, 645 F.3d 998, 1002-03 (8th Cir. 2011) (stating that if an "officer [has] an objectively reasonable concern for officer safety or suspicion of danger" the officer may "conduct a protective sweep of the vehicle … to search for dangerous weapons that the suspect or other occupants might later access."); *United States v. Horton*, 611 F.3d 936, 940–41 (8th Cir. 2010) (stating that once a suspect is legally stopped, "an officer who has reason to believe the detained individual may be armed and dangerous may conduct a pat-down search for weapons to ensure officer safety"). "[T]he legality of such a search depends on 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Long*, 463 U.S. at 1050.

During a *Terry* stop, *Long* allows officers to search an automobile's passenger compartment for weapons if the officers have a reasonable belief—"based on 'specific and articulable facts'"—that the suspect is dangerous and may "gain immediate control of weapons." *Long*, 463 U.S. at 1049 (quoting *Terry*, 392 U.S. at 21). This rule recognizes that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id.* at 1047; *see also United States v. Shranklen*, 315 F.3d 959, 961-62 (8th Cir. 2003). *Long* does not apply where the suspect is handcuffed and under arrest; it applies where the suspect is not secured and might imminently reenter the car. *See Arizona v. Gant*, 556 U.S. 332, 351 (2009); *see Long*, 463 U.S. at 1051.

"The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena*, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring). Officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during a *Terry* stop. *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006). "'However, the use of handcuffs is greater than a *de minimus* intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010)).

Notably, the officer safety exception to the warrant requirement "does not mean that the police may conduct automobile searches whenever they conduct an investigative stop." *Michigan v. Long*, 463 U.S. at 1050 n.14. In reviewing the reasonableness of these actions, the issue is whether the officer had an objectively reasonable concern for officer safety or suspicion of danger. *Id.* at 1050; *United States v. Smith*, 645 F.3d 998, 1002-03 (8th Cir. 2011). The Fourth Amendment inquiry as to whether a protective search was reasonable must focus on the circumstances confronting the officer when he made the decision to search. *United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011). "To be reasonable, suspicion must be based on 'specific and articulable facts' that are 'taken together with rational inferences from those facts'—that is, something more than an 'inchoate and unparticularized suspicion or "hunch."'"). *Id.* (quoting *Terry*, 392 U.S. at 21, 29),

The United States Supreme Court recently narrowed the "search incident to arrest" exception to the Fourth Amendment's warrant requirement, noting that "lower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of [officer safety and evidence preservation]." *Arizona v. Gant*, 556 U.S. at 342 (quoting *Thornton v. United States*, 541 U.S. 615, 624 (2004) (J. O'Connor, concurring in part)). After *Gant*, an arresting officer may search the passenger compartment of a vehicle after an arrest only "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or when it "is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 350 (2009). Moreover, "traditional standards of reasonableness" do not justify the rule "that arresting officers may always search an arrestee's vehicle in order to protect themselves from hidden weapons." *Id.* at 351 (Scalia, J., concurring) (noting that "[w]hen an arrest is made in connection with a roadside stop, police virtually always have a less intrusive and more effective means of ensuring their safety—and a means that is virtually always employed: ordering the arrestee away from the vehicle, patting him down in the open, handcuffing him, and placing him in the squad car.").

In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. *United States v. Place*, 462 U.S. 696, 700-01 (1983) (noting that

in the context of personal property, and particularly containers, the Fourth Amendment challenge is typically to the subsequent search of the container rather than to its initial seizure by the authorities). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012).

"Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Place*, 462 U.S. at 701; *see Jacobsen*, 466 U.S. at 121–22; *Clutter* 674 F.3d at 985 (upholding the warrantless seizure of a suitcase while officers obtained a search warrant, and stating "'[t]his was a plain old-fashioned seizure of a person's effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted" (quoting *United States v. Respress*, 9 F.3d 483, 486 (6th Cir. 1993)).

When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause. *Place*, 462 U.S. at 696 ("Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that

strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime"). However, if the investigative procedure employed with respect to the seized item is itself a search requiring probable cause, the initial seizure cannot be justified on less than probable cause. *Id.* at 706-07 (holding that exposure of respondent's luggage, which was located in a public place, to a dog-sniff did not constitute a "search" within the meaning of the Fourth Amendment).

"'The so-called "automobile exception" permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime.'" *United States v. Farnell*, No. 12-1655, slip op. at 11 (8th Cir. Dec. 4, 2012) (quoting *United States v. Kennedy*, 427 F.3d 1136, 1140–41 (8th Cir. 2005)); *Chambers v. Maroney*, 399 U.S. 42, 48 (1975) ("[A]utomobiles …. may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize."). "In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances." *Kennedy*, 427 F.3d at 1141.

## B.  Fifth Amendment

*Miranda* warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement officials. *See Miranda v. Arizona*, 384 U.S. 436, 484 (1966). *Miranda* protects the constitutional privilege against self-incrimination by

creating a presumption of coercion, and thus inadmissibility, for statements made during custodial interrogations in the absence of warnings. *United States v. Patane*, 542 U.S. 630, 639 (2004) (plurality opinion). *"Miranda* defines custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Hogan*, 539 F.3d 916, 922 (8th Cir. 2008) ( *quoting Miranda,* 384 U.S. at 444). Courts consider six nonexclusive factors to determine whether an individual is in custody for the purposes of *Miranda*: (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; and (6) whether the suspect was placed under arrest at the end of questioning. *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The rule serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. *Oregon v. Elstad*, 470 U.S. 298, 306-307 (1985). Consequently, an unwarned statement that is otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. *Id.*

To have evidence that was obtained after a constitutional violation admitted into court, the government must show that it was not obtained "by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. McManaman*, 673 F.3d 841, 846 (2012) (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963). Evidence is purged of taint and should not be

suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984).  However, "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" does not "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *United States v. Villalba–Alvarado*, 345 F.3d at 1020. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement turns on whether it is knowingly and voluntarily made.  *Id.*  In this analysis, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred."  *Id.*

### C.  Fruit of the Poisonous Tree

The exclusionary rule applies to both direct and indirect fruits of the constitutional violation, including verbal statements.  *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963); *see also United States v. Yousif*, 308 F.3d 820,829 (8th Cir. 2002); *United States v. Villa-Gonzalez,* 623 F.3d at 534.  Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.  *Segura v. United States*, 468 U.S. 796, 804 (1984).  Evidence subsequently obtained and found to be derivative of an illegality is "fruit of the poisonous tree" and must be excluded unless the government can show the evidence would have been inevitably discovered through independent, lawful means or if the later discovery is supported by an independent,

taint-free source. *Villa-Gonzalez*, 623 F.3d at 534 & n.7; *see also McManaman*, 673 F.3d at 846 (stating that the government bears the burden of proving by a preponderance of the evidence that, first, there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct and, second, that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation).

"'The exclusionary rule … when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth Amendment.'" *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (quoting *Brown v. Illinois*, 422 U.S. at 602). In the Fourth Amendment context, the sole purpose of the exclusionary rule is to deter future unlawful police conduct. *Michigan v. Tucker*, 417 U.S. 433, 446 (1974). "Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). *Miranda* warnings, by themselves, do not attenuate the taint of an unconstitutional arrest. *Brown v. Illinois*, 422 U.S. at 602, 605.

Violations of the Fourth Amendment have traditionally mandated a broad application of the "fruits of the poisonous tree" doctrine. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). Under the Fourth Amendment, in order to break a causal chain between an illegal arrest and a statement made subsequent thereto, "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness, but that it be 'sufficiently an act of free will to purge the primary taint.'"

*Brown*, 422 U.S. at 601-02 (quoting *Wong Sun*, 371 U.S. at 486). "The controlling question is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Yousif*, 308 F.3d at 829 (quoting *Wong Sun*, 371 U.S. at 488); *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1040-41 (1984) (stating that the general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004) ("Statements that result from an illegal detention are not admissible."); *Villa-Gonzalez*, 623 F.3d at 535 (the conclusion that defendant was illegally seized mandates suppression of subsequent physical evidence and statements).

### III.  Discussion

First, the court agrees that Officer Normandin's first questioning of the defendant was a custodial interrogation and the statements should be suppressed as a violation of *Miranda*.  The government has not challenged that finding.

The court finds that the magistrate judge, however, erred in his application of the law to the facts with respect to the other statements and evidence.  The threshold issue in this case is whether the seizure of the defendant amounted to an arrest that would require probable cause.  Although the magistrate judge appropriately found the encounter "almost immediately became an investigative detention," he erred in failing to

find that the encounter almost instantaneously thereafter evolved into a de facto arrest. On this record, the court concludes that the handcuffing and frisking of the defendant amounted to a seizure of his person without probable cause and violated his rights under the Fourth Amendment.

Officer Normandin testified only that it was late at night, the defendant and passengers were "ducked down" in a car in a well-lit parking lot, and he observed the defendant reach under the seat. The late hour and remote parking place, coupled with the occupants' conduct, would support a suspicion of criminal activity to justify a limited *Terry*-type investigatory detention and inquiry. However, the officers exceeded the permissible scope of *Terry*, turning the investigatory detention into an arrest for which there was no probable cause.

The factors that courts consider in determining whether an investigative detention has become an arrest weigh in favor of finding an arrest. This is not the case of a lone law enforcement officer—two officers were involved from the outset and more officers arrived on the scene shortly thereafter. At least two squad cars were present. The nature of the crime under investigation was ostensible robbery, but there was no testimony with respect to number or locations of the robberies, whether the alleged robbers were armed, and no description of either suspects or vehicles involved. The officers' articulable suspicions were weak. The only suspicious behavior was reaching under the automobile seat. Pat-downs of the defendant and his companions yielded no weapons or contraband. There is no evidence that the defendant was violent, uncooperative or aggressive. Other than the defendant's gesture of reaching under the

seat, there was no reason to suspect the defendant was armed and dangerous. There was no need for immediate action by the officer.

Also, there was an opportunity for the officer to have conducted himself in a less threatening manner. Officer Normandin did not testify as to any facts indicating a need to handcuff the defendant and the two young women once they were removed from the vehicle.

The government's reliance on "officer safety" concerns to justify their actions in this case are perplexing. The court finds the officers have not shown a reasonable belief based on specific articulable facts that the defendant posed a threat of harm or danger once the defendants and passengers had been removed from the vehicle and patted down

According to the testimony, the officers' patrol of the area was in response to unspecified reports of local robberies of convenience stores. Officer Normandin did not testify as to any specifics of the robberies, including whether weapons had been involved. The officers had no articulable reason to suspect the defendant had participated in robberies based on the physical description of any such robber or the type of vehicle used. There is no evidence that links the defendant or his vehicle to any crimes other than the general geographic area of some unspecified robberies.

Two officers participated in the initial contact and backup officers arrived on the scene almost immediately thereafter. The defendant and the other occupants of the car were removed from the car and searched almost immediately; thereafter no weapons would have been accessible to them. There is no evidence that the area was a high-

crime area and nothing to suggest that the defendant was armed and dangerous. The officers made no attempt to confirm or dispel suspicions the defendant was connected to any robberies or that he was armed and dangerous. Officer Normandin testified that he conducted a search of the vehicle immediately after the defendant was removed from the car.

Cases in which the "officer safety" exception to the warrant requirement have been upheld involve considerably more evidence linking a defendant to a crime or supporting a suspicion that a defendant is armed or dangerous than that involved in this case. *See, e.g.*, *Michigan v. Long*, 463 U.S. at 1035-36 (finding the police officers' conduct was reasonable in searching a car because the occupant had been driving his car at excessive speed, had swerved his car into a ditch, the occupant appeared to be under the influence of an intoxicant, and the officers observed a large knife in the car); *United States v. Stachowiak*, 521 F.3d 852, 853-56 (8th Cir. 2008) (the police officer was justified in his protective search of the vehicle because the officer had information from a reliable confidential informant that the suspect regularly carried firearms, had been observed with firearms, the suspect was driving as if trying to avoid the officer, and the occupant made a "furtive gesture" under the seat); *Smith,* 645 F.3d at 1002-03 (officers were acting on a tip from a reliable confidential informant that there were drugs and guns in the car and the defendant became agitated and officer feared he would begin fighting with the officer and her female partner); *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (officers were investigating an armed robbery, the suspect matched description, he was near the scene of the crime and acting suspiciously, and

officers discovered a wad of cash in a pat-down of the subject); *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) (handcuffing suspects during a *Terry* stop was reasonably necessary to achieve purposes of the stop where suspects outnumbered officers by six to three and one officer had to investigate another location); *Stewart*, 631 F.3d at 457-58 (several facts, taken together justified protective search: officers were aware the defendant had a prior felony conviction, it was late at night in an area where suspects had parked vehicles after previous robberies at a convenience store, the suspect had departed a convenience store and the area had suffered rash of robberies and was a hot spot for criminal activity); *Horton*, 611 F.3d at 940–41 (officers had reports of odd behavior and information the defendant was carrying a knife, and the suspect matched physical description); *United States v. Robinson*, 670 F.3d 874, 877 (officers were relying on tip of a security guard that suspect had a gun, had been ejected from a club, was intoxicated and hostile and the defendant's vehicle matched the description of the car); *Maltais*, 403 F.3d at 556 (commenting that detention in a police car was "reasonably related to the need for officer safety and prevention of flight while unassisted at a remote location in the middle of the night); and *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991) (concluding that an officer who observed the defendant's "suspicious movements to the floorboard" and who had "information that the defendant was manufacturing drugs gave the officer reason to believe that [he] may have been carrying a weapon" and was therefore justified in performing a pat-down search).

Similarly, there is no objectively reasonable concern for officer safety or danger to justify a protective sweep of the car for weapons that the defendant might later access. *Michigan v. Long*'s "protective sweep" rationale applies only to persons who are not arrested and will be placed back in their car. *Long* does not apply when a subject has been arrested. There is no evidence that the officers planned to release, or would have released, the defendant to send him on his way in his vehicle. Officer Normandin testified, in fact, that the defendant was not free to leave.

By his own admission, Officer Normandin searched the vehicle immediately after removing the occupants from the car. Importantly, this case does not involve a traffic stop, where the violation of a traffic law would support a suspicion of criminal activity. The defendant was sitting with two other people in the well-lit parking lot of an open business. Although it was 12:45 a.m., the late hour alone and the fact that people were in a car does not automatically signal an inherently dangerous situation. Any suspicion of illegal activity prompted by the occupants' behavior in ducking down and reaching under the seat would have been explained by the officers' observation of open containers in the vehicle. The officers herein did not conduct a limited *Terry*-type inquiry in order to confirm or dispel their suspicions; they proceeded to immediately search the vehicle as if the search were "a police entitlement," rather than an exception justified by the twin rationales of officer safety and evidence preservation.

Moreover, the officers' conduct with respect to the closed container found in the search of the vehicle requires a separate analysis. The government has not argued or shown that the detention of the box was so minimally invasive that strong countervailing

governmental interests justified a seizure based on specific articulable facts that the lockbox contained contraband or evidence of a crime. The court finds the removal of the lockbox from the car was a meaningful interference with the defendant's possessory interests and finds the lockbox was seized when it was removed from the vehicle. The later investigative procedure—opening the box—was a search itself requiring probable cause, so the initial seizure cannot be justified on less than probable cause.

The officers did not have probable cause to believe that the vehicle contained contraband or other evidence of a crime to support the seizure and subsequent search of the lockbox found under the seat of the defendant's car. Officer Normandin explicitly disavowed any suspicion of drug trafficking. He stated that his only concern was officer safety.

Again, reliance on the "officer safety" exception is misplaced. Although Officer Normandin testified that the lockbox was large enough to have contained a handgun, he likely would have known upon lifting it that it did not contain a handgun. The defendant was indicted for possession with intent to distribute 5 grams or more of methamphetamine. That would weigh a fraction of an ounce. Even if there were up to 50 grams of an illegal substance in the lockbox, the weight of the contents of the lockbox would weigh under two ounces.[3] It is not clear from the record whether the $1,780 seized was in the lockbox or on the defendant's person and there is no evidence of the denomination of the bills which would give a clue to its weight. However, any

---

[3] It stands to reason that if more than 50 grams of actual methamphetamine were recovered, the defendant would have been charged with possession with intent to distribute more than 50 grams of actual methamphetamine.

officer- safety concerns with respect to the lockbox likely would have been allayed once the officer had handled the lockbox enough to determine that there was no weapon inside it. Clearly there was no evidence that the defendant or the two young girls could gain access to the contents of the box because the defendant and passengers were "some distance" away from the vehicle sitting on a curb, they were handcuffed, and the officer was in possession and control of the box.

Absent the defendant's unwarned statement while in custody, the officers had no reason to suspect the container held contraband or evidence of a crime and they had no legitimate concern for officer safety because it was unlikely the box contained a weapon and the defendant had no access to it in any event. Also, there is nothing in this record to suggest that the officers had any intention to prevent the disappearance of evidence until a warrant could be obtained.

The court also finds the magistrate judge erred in applying Fifth Amendment jurisprudence to the "fruits of the poisonous tree" analysis under the facts of this case. Because the court finds the defendant was illegally detained, the relevant inquiry is whether subsequently seized physical evidence (the box and its contents) and the defendant's later warned statement were obtained as a result of an illegal detention, not whether it was obtained via a *Miranda* violation. A statement made in a custodial interrogation after an illegal seizure must be suppressed unless the government shows that intervening events broke the causal chain between the illegality and the statements. The evidence adduced at the hearing does not show that the defendant's post-*Miranda* statements were an act of free will sufficient to purge the taint of the earlier violations.

The defendant had been seized at gunpoint, forcibly removed from his vehicle, patted down and handcuffed, and his car was searched without probable cause. He was Mirandized after his first incriminating statement, but made his post-warning statement only minutes later, while still in custody and in handcuffs, in response to additional police questioning.

The court finds the fruit of the poisonous tree doctrine applies in these circumstances. Morgan's unwarned statements were themselves the result of an illegal seizure. He was questioned and made the statements after he had been removed from his vehicle at gunpoint, after having been patted-down and handcuffed. The initial constitutional violation was a Fourth Amendment violation. Accordingly, under *Wong Sun*, the evidence must be suppressed. The argument that the box was opened as a result of the post-*Miranda* statements is specious. He was seized without probable cause, which led directly to the search of the car, for ostensible "officer safety." The illegal arrest preceded and led to the subsequent admissions.

Although the facts do not support a conclusion that the seizure of the lockbox was the result of the statements, the court finds that even under a Fifth Amendment analysis the evidence would not show the warned statements were sufficiently an act of free will to purge the taint of the earlier unwarned statements. The participants were the same, the location was the same, and the statements were close in time.

Further, the inevitable discovery doctrine is inapplicable in this case. The government did not show, by a preponderance of the evidence, that the information ultimately or inevitably would have been discovered by lawful means. As stated above,

the police officers have not shown a reasonable, articulable concern for officer safety or suspicion of danger. To hold otherwise would mean that police could search any vehicle "as a matter of police entitlement," and could "conduct automobile searches whenever they conduct an investigative stop," by simply invoking "officer safety," in clear contravention of the Supreme Court's holdings in *Gant*, 556 U.S. at 342, and *Long*, 463 U.S. at 1050 n.14. This court recognizes the need for officers to act quickly to protect their safety; however without any reasons other than the defendant's presence in the parking lot, his conduct in ducking down, and the "furtive gesture" to support the hunch that the defendant had a weapon, the officers did not have a reasonable belief that the defendant was dangerous to justify the search in this case. Accordingly,

      IT IS ORDERED:

      1. The F&R of the magistrate judge(Filing No. 29) is adopted in part and rejected in part consistent with this Memorandum and Order.

      2. The defendant's objection (Filing No. 30) to the F&R of the magistrate judge (Filing No. 29), is sustained.

      3. The defendant's motion to suppress (Filing No. 18) is granted.

      Dated this 11th day of December, 2012.

                         BY THE COURT:


                         s/ Joseph F. Bataillon
                         United States District Judge